# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

REGINALD L. ODUM,                       )
                                    )
       **Plaintiff,**      )
                                    )      **CIVIL ACTION**
v.                                      )
                                    )      **No. 15-9552-JWL**
NANCY A. BERRYHILL,[1]                   )
**Acting Commissioner of Social Security,**   )
                                    )
       **Defendant.**      )
_____ )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security (hereinafter Commissioner) denying Disability Insurance benefits (DIB) and Supplemental Security Income (SSI) benefits under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social Security Act. 42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding the Administrative Law Judge's (ALJ) decision is not supported by the record evidence and is inadequately explained, the court ORDERS that the decision shall be REVERSED and that judgment shall be entered

---

[1]On Jan. 20, 2017, Nancy A. Berryhill, became Acting Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant. In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

pursuant to the fourth sentence of 42 U.S.C. § 405(g) REMANDING the case for further proceedings consistent with this decision.

## I.     Background

Plaintiff applied for DIB and SSI benefits, ultimately alleging disability beginning December 22, 2007.  (R. 772).  The decision at issue is a decision after a prior sentence four remand by a court of this district.  (R. 889-905).  Plaintiff has exhausted proceedings before the Commissioner, and now seeks judicial review of the final decision denying benefits.  He argues that the ALJ's residual functional capacity (RFC) assessment is unsupported by the record evidence because the ALJ erroneously weighed the medical opinions and erroneously omitted any limitations resulting from swelling in his legs, and that the ALJ's step four finding that Plaintiff can perform his past relevant work as a reception clerk is legally flawed.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court determines whether the ALJ's findings are supported by substantial evidence and whether he applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability. 20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Williams, 844 F.2d at 750-51. After evaluating step three, the Commissioner

assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step

four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process--

determining at step four whether, in light of the RFC assessed, claimant can perform his

past relevant work; and at step five whether, when also considering the vocational factors

of age, education, and work experience, claimant is able to perform other work in the

economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one

through four the burden is on Plaintiff to prove a disability that prevents performance of

past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord,

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.

At step five, the burden shifts to the Commissioner to show that there are jobs in the

economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084,

1088 (10th Cir. 1999).  The ALJ in this case found at step four that Plaintiff is able to

perform his past relevant work as a reception clerk as he actually performed it.  (R. 785-

86).  Therefore he found that Plaintiff is not disabled within the meaning of the Act, and

did not make any findings at step five.  Id.

The court finds remand is necessary because the ALJ did not adequately explain

his assessment of Plaintiff's exertion level, his evaluation of Plaintiff's reading disorder

or illiteracy in light of his age, and Plaintiff's ability to perform past relevant work.

**II.     Discussion**

4

Born on May 24, 1961 (R. 303), Plaintiff turned fifty in May of 2011.  Plaintiff claims he is illiterate and that he cannot perform medium level exertion.  These facts provide the crux of the issues in this case.  Plaintiff quotes the Social Security regulations for the proposition that when a claimant is over fifty and his vocational scope is limited by illiteracy, "a finding of disabled is warranted."  (Pl. Br. 28) (quoting 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 202.00(d)).  On that basis he argues that he should have been found disabled.  Id.

The question before the court is whether the Commissioner properly determined that Plaintiff is not illiterate or is able to perform medium level work.  The issue of illiteracy was skirted rather than addressed head-on in the decision at issue and while the ALJ found Plaintiff is able to perform medium exertion level work, his decision is inconsistent in that regard, and he did not resolve those ambiguities.

Judicial review must begin with what the Commissioner actually decided, so the court begins with a review of the ALJ's findings regarding literacy and regarding Plaintiff's exertional limitations.

**A.**      **The ALJ's Decision**

In his step two discussion, the ALJ found that one of Plaintiff's severe impairments is "a reading disorder."  (R. 772) (bolding omitted).  The ALJ assessed Plaintiff's RFC consistent with a medium exertion level, specifically finding that "he can lift, carry, push, and pull twenty-five pounds frequently and up to fifty pounds occasionally," and with regard to mental abilities, that "he can understand and carry out

unskilled and low-level semi-skilled instructions; and he needs a job that does not require reading or writing." (R. 775) (bolding omitted). The ALJ explained:

> With regard to his alleged illiteracy, he testified he attended school through the first grade before he was taken from his parents and put in a juvenile detention center with no additional formal education. He testified he earned his CNA license and worked as a CNA for ten years. He testified he attempted to attend a literacy program, but there were not enough volunteers to support the program.

(R. 776). The ALJ noted that Dr. Hutchinson testified as a psychological expert at the disability hearing and stated that the record did not contain a diagnosis of learning disorder for Plaintiff, that Plaintiff's school records contained the results of a Stanford-Binet IQ test revealing a low-average IQ score of 85, and that Dr. Hutchinson opined that Plaintiff's mental impairments are not severe within the meaning of the Act. Id. And, he noted Dr. Hutchinson's opinion that "a person with the claimant's level of intellectual functioning should be able to learn to read." Id. at 777.

The ALJ summarized the record evidence, noting among other facts that Plaintiff reported lifting weights regularly, id. at 778, that the record reveals a history of reading disorder, confirms Dr. Hutchinson's testimony that Plaintiff achieved a score of 85 on the Stanford-Binet IQ test, and contains a letter from the Independence School District that Plaintiff enrolled in the adult education program in March 2011 and had tested at the beginning literacy level in reading and language. (R. 779). He discussed a psychological consultative evaluation that Plaintiff underwent in 2014:

> On September 22, 2014, the claimant underwent a psychological consultative evaluation performed by Tammy Sheehan, Psy.D. (Exhibit

39F).  During the evaluation, he alleged he is illiterate (Exhibit 39F).  As
part of the evaluation, Dr. Sheehan attempted to administer the Wide Range
Achievement Test-4[th] Edition (WRAT-4) to determine the claimant's level
of literacy.  In response to the test, the claimant stated he could not read
(Exhibit 39F/1 ).  Dr. Sheehan informed the claimant even people who are
not literate are often able to read small words and that the WRAT test was
to determine at what level he is able to read, if at all (Exhibit 39F/1).  Dr.
Sheehan handed the claimant a reading list of words and the claimant was
able to read the words "cat, in, tree, how, hair, spell, even, and finger," but
he missed the words "book, animal, size, felt, and laugh" (Exhibit 39F/1).
After missing the last word, the claimant held up his hands and said "I'm
not doing this!" (Exhibit 39F/l).  Dr. Sheehan attempted to continue the
exam and the claimant refused in a loud voice with the use of profanity
(Exhibit 39F/1).  Dr. Sheehan documented the claimant refused further
WRAT-4 testing (Exhibit 39F/1).

(R. 779).  The ALJ noted that at a consultative psychological evaluation in July 2013

Plaintiff reported to Dr. Lieberman that he quit school in the second grade and is illiterate.

Id. at 781.  The ALJ noted the opinions of the state agency non-examining psychologists

that Plaintiff "has a moderate limitation on his ability to travel in unfamiliar places or use

public transportation," and that Plaintiff's "memory and reading problems would limit his

ability to follow and carry out detailed instructions, but he is capable of following and

carrying out simple instructions."  Id. at 781-82.

The ALJ noted Dr. Kindling's (the non-examining state agency medical

consultant) opinion that Plaintiff can lift and carry twenty-five pounds frequently and fifty

pounds occasionally.  Id. at 782.  He noted that Dr. Gaeta was a physician who testified at

an earlier disability hearing before the remand by the district court and later provided an

interrogatory to update his opinion after the latest disability hearing, and that Dr. Gaeta

opined that Plaintiff "could lift and carry twenty pounds frequently and fifty pounds

occasionally."  Id.

The ALJ found that Plaintiff's work history was a factor discounting his credibility

because it showed only sporadic work prior to his alleged onset date and that Plaintiff

reported "he only stopped working at his last job because the program that allowed him to

work while being illiterate was eliminated."  Id. at 784.  The ALJ also found

inconsistencies in the record evidence regarding Plaintiff's alleged illiteracy:

> A letter from the Independence School District in May 2011 indicates the
> claimant tested at the beginning literacy level in reading and language
> (Exhibit 13E).  However, the letter does not contain any specific
> information concerning the testing administered to determine the claimant's
> literacy, the claimant's effort and level of cooperation during the purported
> testing, or the qualifications of the individual administering the test.
> Following a consultative evaluation in July 2013, the claimant was
> diagnosed with a reading disorder (Exhibit 33F).  However, the consultative
> examiner did not document any literacy testing in her evaluation and it
> appears this diagnosis was based on the claimant's self-reported literacy
> problems.  Additionally, in September 2014, the claimant attended a
> subsequent consultative evaluation for the purpose of testing his reading
> and writing ability (Exhibit 39F).  The consultative examiner attempted to
> conduct literacy testing, but the claimant refused to cooperate or participate
> in the testing.  However, prior to his refusal to engage in any additional
> testing, the claimant demonstrated the ability to read the words "cat, in, tree,
> how, hair, spell, even, and finger" (Exhibit 39F/l).  The claimant's ability to
> read several words on the test indicates he has some level of literacy.
> However, the claimant's level of literacy is impossible to fully determine
> due to his refusal to participate in the offered testing.
>
> Also, the claimant testified he only attended school in the Kansas City
> Public Schools until the first grade and that he did not attend any school
> after the first grade.  However, the claimant's testimony is inconsistent with
> his education records, which document his attendance and tardiness for five
> school years from 1974 to 1979 (Exhibit 8E/4).  During that period, the
> claimant would have been 13-18 years old, which would be well after he

> testified he left school in first grade at the age of 7.  When confronted with
> this inconsistency, the claimant admitted he may have been wrong and that
> these classes were in a juvenile detention center or group home.

(R. 784-85).

In explaining his RFC assessment, the ALJ noted that Plaintiff's "reading disorder has been taken into consideration by limiting him to work that does not require reading or writing." Id. at 785.  He stated that both Dr. Kindling and Dr. Gaeta "found the claimant is capable of medium work," and he agreed with Dr. Hutchinson's opinion that Plaintiff is "not disabled by his mental impairments." Id.

The ALJ found at step four of the evaluation process that Plaintiff "is capable of performing past relevant work as a reception clerk," because that work "does not require the performance of work-related activities precluded by the claimant's residual functional capacity." Id. (bolding omitted).  He found that Plaintiff "was able to perform this job with his reading ability" as he performed it.  Id. at 786.  He found that Plaintiff would be able to perform his past relevant work even if he were limited to sedentary or light exertion, and noted that "the vocational expert testified there are light exertional level jobs a hypothetical individual could perform with the above residual functional capacity." Id.

**B.**     **Analysis**

The ALJ found that both Dr. Kindling[2] and Dr. Gaeta opined that Plaintiff is able to perform medium work. (R. 785). Dr. Kindling clearly did so because he opined that Plaintiff can lift 50 pounds occasionally and 25 pounds frequently. (R. 883). Dr. Gaeta did not. At the disability hearing on November 21, 2011, Dr. Gaeta testified as a medical

---

[2]Plaintiff argues that he is "troubled by the fact that the actual opinions from Dr. Kindling do not appear in the record," but that it "is apparently a summary of Dr. Kindling's opinions apparently incorporated into a determination by an SDM [(single decisionmaker)]." (Pl. Br. 21) (citing R. 875-88). The document to which Plaintiff cites is the Disability Determination Explanation completed at the reconsideration level. (R. 875-88). While the document was signed by a Disability Adjudicator, or an Examiner (R. 888), the Physical RFC assessment in that form was signed by Dr. Kindling (R. 884), and it is by no means clear that the individual who signed the form itself is an SDM. It has been the court's experience that while the RFC assessments at the initial level may be made by an SDM, the RFC assessments at the reconsideration level are made by state agency psychological consultants (PC) and/or state agency medical consultants (MC).

In fact, in this case the Disability Determination Explanation at the initial level contained sections labeled Medically Determinable Impairments and Severity (R. 865-66), Physical Residual Functional Capacity Assessment (R. 867- 69), and Mental Residual Functional Capacity Assessment (R. 869-71), each seeking the signature of an "MC/PC or SDM," and at the end of the form there is a place for an MC/PC or SDM to sign, and a place for a Disability Adjudicator/Examiner to sign. (R. 873). The impairments and severity section was signed by Dr. Stern, a state agency PC (R. 866), the physical RFC assessment section was signed by Ms. Strobel, an SDM (R. 869), the mental RFC assessment section was signed by Dr. Stern (R. 871), and at the end of the form, Dr. Stern signed as the MC/PC and Ms. Strobel signed as the Disability Adjudicator/Examiner. (R. 873).

While the form used at the reconsideration level in this case contains the same sections, nowhere does it ask for an SDM signature. In every preliminary section it asks only for an MC/PC signature (R. 881, 884, 886), and at the end of the form there is a place for an MC/PC signature and a place for a Disability Adjudicator/Examiner to sign. Therefore, while the non-medical source who signed at the end of the reconsideration form may also be an SDM, he signed this form in his capacity as a disability adjudicator/ examiner. The physical RFC assessment in the form was signed by Dr. Kindling. (R. 884). There can be no doubt that the physical RFC assessment in the reconsideration disability determination explanation comprises the opinion of Dr. Kindling.

expert regarding Plaintiff's physical capabilities.  (R. 82-147, reproduced at 1129-94).  He

opined that Plaintiff could lift "at least 20 pounds," and could lift 10 pounds frequently.

(R. 95, 1142) (duplicate copies).  Therefore, he opined that Plaintiff could lift and carry at

the light exertion level, and would therefore be unable to perform medium level work.

Dr. Gaeta provided answers to an interrogatory after the disability hearing on remand

from the district court. (R. 1380).  In the interrogatory, Dr. Gaeta was reminded that he

testified at the earlier hearing that Plaintiff could lift at least 20 pounds, and was informed

that "[a] medical doctor for the Agency reviewed this case on January 29, 2014 and found

the claimant was capable of lifting 50 pounds occasionally and 25 pounds frequently."

(R. 1263).  He was then asked to provide an opinion whether Plaintiff can lift more than

20 pounds, and if so to opine how much Plaintiff could lift occasionally and frequently.

Id..  Dr. Gaeta responded that Plaintiff can lift and carry 20 pounds frequently and 50

pounds occasionally, and has been able to do so since December 22, 2007 (Plaintiff's

alleged onset date).  (R. 1380).

 Since Dr. Gaeta opined that Plaintiff can lift only 20 pounds frequently, he did not

opine that Plaintiff can lift sufficient weight to perform the full exertion required by

medium level work.  Therefore, the ALJ's finding that both Dr. Gaeta and Dr. Kindling

found Plaintiff capable of medium work is not supported by the record evidence and is

erroneous.  Therefore, the ALJ's finding that Plaintiff is able to perform medium work is

also unsupported by the record evidence because he did not resolve the ambiguity created

by the inconsistent medical opinions.  Remand is necessary to resolve the ambiguity and to determine whether Plaintiff is able to perform medium work.

If Plaintiff is unable to perform the full range of medium work, the question arises whether he is illiterate, and if so, whether he was disabled after attaining the age of fifty. The ALJ did not decide whether Plaintiff is illiterate.  In fact, the decision can be read variously to imply that Plaintiff is illiterate, that Plaintiff is not illiterate, or that Plaintiff is deemed literate because he refused to participate in literacy testing.  But, the ALJ did not choose any of the possibilities.  The court addresses each suggestion in term, and remands for the Commissioner to finally decide the question.

The decision implies that Plaintiff is illiterate, in that the ALJ found that Plaintiff "needs a job that does not require reading or writing."  (R. 775) (bolding omitted).  The regulations define illiteracy as "the inability to read or write."  20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).  The regulations explain that the agency considers "someone illiterate if the person cannon read or write a simple message such as instructions or inventory lists even though the person can sign his or her name."  Id.  The record contains evidence which the ALJ quoted indicating that Plaintiff can read words such as "cat, in, tree, how, hair, spell, even, and finger."  (R. 784) (quoting R. 1381).  But the same record, quoted elsewhere by the ALJ, indicates that Plaintiff "missed the words 'book, animal, size, felt, and laugh.'" (R. 779) (quoting R. 1381).  The ALJ acknowledged that the Independence School District provided a letter stating that Plaintiff tested in reading and language at the beginning literacy level (R. 779) (citing R. 413), and

12

that letter also noted that the beginning literacy level was "Pre K." (R. 413). The ALJ acknowledged the state agency psychologists' opinion that Plaintiff "has a moderate limitation on his ability to travel in unfamiliar places or use public transportation," (R. 781), and those opinions explain this limitaiton is because of Plaintiff's "poor reading ability." (R. 871, 886). The ALJ found that Plaintiff "only stopped working at his last job because the program that allowed him to work while being illiterate was eliminated." Id. at 784. All of this is evidence that Plaintiff cannot read or write simple instructions or inventory lists, and is therefore illiterate within the meaning of the regulations. Thus, the decision at issue may be read to imply that Plaintiff is illiterate within the meaning of the Act and regulations. And, if he is also limited to light or sedentary work, he must be found disabled upon attaining the age of fifty.

The decision at issue may also be read to imply that Plaintiff is not illiterate. The ALJ noted that Plaintiff received a license in Kansas as a certified nursing assistant (CNA) and worked in that field for ten years. He noted Dr. Hutchinson's opinions that the record did not contain a diagnosis of learning disorder, that Plaintiff scored 85 on a Stanford-Binet IQ test, and that a person with that level of intellectual function should be able to learn to read. The ALJ found that Plaintiff's allegations of symptoms, including allegations concerning education and literacy are not credible. The ALJ noted inconsistencies in the record regarding Plaintiff's attendance at school, and found that Plaintiff's "ability to read several words on the [(WRAT-4)] test indicates he has some level of literacy." (R. 785) (emphasis added). Moreover, the ALJ found at step four of

the evaluation process that Plaintiff is able to perform his past relevant work as he performed it, even if he were limited to light or sedentary exertion.  All of this is evidence and rationale suggesting that Plaintiff is not illiterate.  But, because the ALJ acknowledged that Plaintiff was allowed to perform his past relevant work only until the employer decided no longer to accommodate his illiteracy, the finding that Plaintiff could return to that work begs the question whether accommodated work qualifies as "past relevant work" within the meaning of the Act and regulations.

Finally, the decision may be read to imply that Plaintiff was deemed literate because he refused to complete literacy testing.  This conclusion may be inferred from the ALJ's summary of Dr. Sheehan's administration of the WRAT-4 test wherein Plaintiff stopped after the last word he missed, refused to continue the exam with the use of profanity, and left the office.  (R. 779) (citing R. 1381).  The ALJ found that "Dr. Sheehan documented the claimant refused further WRAT-4 testing."  (R. 779).  Later in the decision, the ALJ found that "the claimant's level of literacy is impossible to fully determine due to his refusal to participate in the offered testing."  (R. 785).  But, the ALJ did not specifically state that he deemed Plaintiff literate on the basis of his refusal, and he did not discuss whether the partial testing was sufficient to preclude a deemed finding of literacy given the basic level of the words admittedly missed before Plaintiff refused to continue.  In other words, in light of the record evidenced discussed above, perhaps the ALJ should have considered whether Plaintiff's level of literacy could be approximately determined even though it could not be "fully" determined.

14

In any case, the decision might be read to imply that Plaintiff is literate, that he is illiterate, or that he should be deemed literate.  But the ALJ did not specifically decide on any one of those possibilities, or on some other possibility of which the court is unaware. It is the court's position to decide whether the Commissioner applied the correct legal standard and whether the record evidence supports the decision made, not to make a decision in the first instance.  Remand is necessary for the Commissioner to finally decide and to articulate her rationale for the decision made.

**IT IS THEREFORE ORDERED** that the Commissioner's decision shall be REVERSED and that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) REMANDING the case for further proceedings consistent herewith.

Dated this 9th day of February 2017, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**